# ROSCOE M. PACKARD *vs.* THOS. G. HAYES, PRESIDENT OF BOARD OF AWARDS, SAM'L A. RICE, ET AL.

*Municipal Contracts—Award to Lowest Bidder—Requirements of Advertisement for Bids—Specifications Must Contain All the Essentials of the Contract Proposed—Injunction to Restrain Execution of Proposed Contract—Ratification.*

When a municipal board is directed by statute to advertise for proposals for doing certain work, and to award the contract to the lowest bidder, the advertisement, or the specifications referred to in it, must set forth definitely all the essential elements of the contract as the common basis for the bids asked for, so that there may be competitive bidding for the same work.

When a municipal board advertises, in pursuance of such statutory authority, for proposals for collecting and disposing of the garbage, etc., in the city, and each bidder is required by the specifications to submit with his bid a scheme for the disposal of the garbage, with such information as may be necessary to enable the Commissioner to determine the feasibility of it, no contract can lawfully be made under such an advertisement, because each bidder is allowed to submit his own plan for the disposal of the garbage, and there is consequently no definite basis for competition among the bidders, common to them all.

In the letting of a municipal contract by competitive bidding, the provisions of the statute relating thereto must be strictly observed.

When a municipal Board of Awards has made a contract in violation of the statute relating to the matter, the contract is *ultra vires* and void and cannot be ratified by the municipal government.

A taxpayer is entitled to file a bill to enjoin the execution of a void contract entered into by a municipality, and the motives of the plaintiff in bringing the suit are immaterial.

The charter of Baltimore City provides that in contracting for any public work involving a certain expenditure proposals for the same shall be advertised for and the contract for doing the work shall be awarded by the Board of Awards to the lowest responsible bidder. In pursuance of this power, the Commissioner of Street Cleaning advertised for proposals for the collection and disposal of garbage, etc., in the city, according to specifications obtainable in his office. These specifications provided that " each bidder must submit with his bid the scheme of garbage disposal he proposes to establish * * including such plan, specification and other information as may be necessary to enable the said

Commissioner to determine the feasibility of it." R. submitted a bid in which he proposed to remove the garbage to a suitable place in or out of the city and there reduce it by the method now in use at Syracuse, or with such modification thereof as shall be approved by the Commissioner, or to reduce the garbage by the use of such other method as shall be agreed upon by him and the Commissioner. Each of the other bidders proposed a different plan for the reduction and disposal of the garbage. The contract was awarded to R. and the plaintiff, as a taxpayer, filed a bill to restrain the execution of the contract on the ground that the above mentioned requirements of the charter had not been observed in awarding the contract. *Held*,

1st. That all the essentials of the contract proposed to be made must be placed before the bidders in the advertisement with such precision that nothing will remain to be done except to ascertain the lowest responsible bidder, and the Board of Awards has no power except to award the contract to such bidder.

2nd. That the scheme or plan for the disposal of the garbage was an important feature of the contract designed to be made in this case, but the specifiations were defective in that they failed to indicate any particular plan with reference to which bids were to be made.

3rd. That the absence of any definite basis for competition among the bidders; the allowing of each bidder to submit his own independent proposal as to what would form an important element of the contract, and the reservation of a discretion to be exercised in an essential matter by the Commissioner after the bids had been submitted render the contract awarded to R. one made in violation of the intent of the statute as well as of real competitive bidding and the same is consequently void and its execution should be enjoined.

Appeal from a decree of the Circuit Court of Baltimore City (Ritchie, J.), dismissing the bill of complaint.

The cause was argued before McSherry, C. J., Fowler, Boyd, Schmucker and Jones, JJ.

*John V. L. Findlay*, (with whom was *Morrill N. Packard* on the brief), for the appellant.

The main contention, is that specifications on vital questions were violated in awarding this contract. What they called for was not a mere proposal to reduce the city garbage, but a scheme or plan showing the method and process of reduction. The Commissioner in charge of the preparation of the specifications must have understood what he meant, and

he positively asserts that Rice had not filed any plan with his bid. After the bids had been opened on the 21st and tabulated, Rice, three days afterwards, did send him a plan, but it was a plan of a system now in use in *Detroit.* And although Rice offers in his bid to do the work in any way, which, of course, would include the system in Detroit or London, yet the contract awarded him was not to do the work according to the *Detroit* but the *Syracuse* system, and therefore he offers no plan, as the Commissioner understood the meaning of the word, in connection with his bid as accepted.

It was argued below that the charter of the city only required an advertisement for proposals, and what the proposals should contain was not essential. Under an Act requiring an advertisement for a public building, the advertisement required that price of stone at the quarry in the rough, as well as when dressed, should be given in the proposal. The contract was awarded to one as the lowest bidder who had not given the price of the stone as dressed, and the award was enjoined at the suit of a taxpayer. *McIntyre* v. *Perkins,* 9 Phil. 448. The requirement of a plan or scheme to show how the proposal for reduction would work out in actual practice is not only reasonable but imperative. It is admitted that if an ordinance or statute had prescribed this as one of the conditions of letting the contract, there could have been no escape from compliance. *Mayor, etc.,* v. *Keyser,* 72 Md. 106; *Rieketson* v. *Milwaukee,* 47 L. R. A. 685.

Now the charter does not prescribe what the advertisement for proposals shall contain, but it does provide that contracts shall be let to the lowest responsible bidder after advertising for proposals for a certain number of days. And the question is whether there is any difference in principle between a failure to comply with a fundamental requirement prescribed in the proposal when the board is acting under a general authority from the charter, and such a failure, where the statute or ordinance itself designated the terms of the proposals. We must look at the reason of the thing. The object of the proposal is to fix in definite terms the precise nature of the

offer which the bidder makes in response to the advertise-
ment.   All bidders are to be treated alike, and in this case the
proposals in part were prepared with proper blanks provided
by the Commissioner and were called specifications.   The bids
were made in accordance with these specifications, which at
once became a part of them.   Now had the Board of Awards
any more right to disregard one of the *essential* requirements
of those specifications prescribed by its authority than it would
have to disregard a provision of the charter, which in terms
required that the specifications should embrace that particular
requirement ?   It would be impossible for the charter to pre-
scribe what should be inserted in all the specifications for pub-
lic work to be done under contract with the city.   And when
it authorized the Board of Awards to advertise for proposals
and let the work on these proposals, it meant that they should
contain whatever was vital or essential to competitive bidding
and the proper protection of the city's interests, and when
proposals containing these vital and essential elements were
prescribed by this board, it had no more right to depart from
them than to violate an express authority.   It must be re-
membered that as the case was heard on bill and answer, and
as the bill charges that there was no plan filed as required by
the specifications, and the owner does not deny the charge,
but seeks to evade and avoid its effect by claiming under the
circumstances that no plan was necessary, the Court is con-
fronted with the proposition whether a municipal board invit-
ing proposals for the construction of a work of this magni-
tude and prescribing the terms on which they would be re-
ceived, can waive them at its discretion.   There is no ques-
tion in the case as made that the filing of the plan was nec-
essary, and if the requirement as to it could be waived, then
any other requirement could be treated in the same way, and
there would be no safeguard thrown around the procedure,
and the equality between bidders, which can alone insure com-
petition, would be destroyed.   The answer claims the right
to waive, but the only case cited in support of it was the case
of *Madison* v. *Harbor Board of Baltimore City*, 76 Md. 395.

This case, although decided four years after the *case of Keyser*, in 72 Md., makes no reference to it, and evidently was not intended to disturb or overrule the principles on which it was decided.

Rice's description of his plan for disposing of the garbage by a simple reference to the place where it happens to be in operation without anything else is too vague and general to be accepted as a proper safeguard of public rights. The commissioner was entirely right, therefore, when he reported against this bid on this ground alone, and it ought not to have been accepted. In addition to the authorities already cited, and as having a bearing upon the case, we cite the following: *Kneeland* v. *Furlong*, 20 Wis. 437 ; *Dickinson* v. *Poughkeepsie*, 7 Hun. 1 ; *Weed* v. *Beach*, 56 How. Pr. 470 ; *Boren* v. *Darke Co.*, 21 Ohio, 311 ; *Smith* v. *Syracuse*, 17 Ap. Div. 44 N. Y. Supp. 852. It is reasonably clear that Rice himself could not have enforced his claim to the contract by *mandamus* or injunction, and that the requirement of a plan is indispensable to competitive bidding. *Mazet* v. *Pittsburg*, 137 Pa. 548 ; *Fones Bros. Hardware Co.* v. *Erb*, 13 L. R. A. 353 ; 54 Ark. 645, and cases collected in note to *Anderson* v. *Board, etc.*, 26 L. R. A. 707 ; *Schuman* v. *Seymour*, 24 N. J. Eq. 143.

*Bernard Carter* and *Thos. R. Clendinen* (with whom was *Wm. S. Bryan, Jr.*, on the brief), for the appellee, Rice.

The only reason for requiring any plans to be filed by Mr. Rice would be that such was the regulation under which the bidding was let for competition. This is supposed to be the requisite of the third general regulation of the specifications : "Each bidder must submit with his bid the *scheme of garbage disposal* which he proposes to establish marked so as to correspond to the proposal which it is to accompany, and including *such plan*, specifications and other information *as may be necessary to enable the said commissioner to determine the feasibility of it.*" It is seen at a glance that it is only in the event that *some* plan is necessary to enable the commissioner to determine the feasibility of the plan of garbage reduction, that

there is any requirement for the filing of a plan; and in the cases where the filing of any plan is required, it is only *such* plan as may be *necessary to enable the Commissioner of Street Cleaning to act understandingly.* In view of the fact that the answer of Mr. Rice (which is to be taken as true, the case being set down on bill and answer), states: " Plans of the Syracuse system were not filed with the bid, *because as that system was known to this defendant to be known to the Commissioner of Street Cleaning*, such filing was not necessary to let the said commissioner understand fully the system bid upon," it is difficult to imagine what useful purpose could have been served by filing any plans. No plans, no matter how elaborate and full could be necessary " to enable the commissioner to determine the feasibility " of the Syracuse system after he had himself visited Syracuse and had seen that system itself in active and successful operation. Nor could any paper plans be as effective for the purpose named as the buildings and plant, themselves, in actual existence and operation.

If there had ever been any question about the original validity of the award of the contract to Mr. Rice, the award of that contract was subsequently ratified by the whole city government, the Mayor and the City Council. The answer of Rice and accompanying exhibits show that the Board of Estimates, as required by section 36 of the new charter, had duly prepared a list of proposed and estimated expenditures of the city for the year 1901, and known as the Departmental Estimates; that in this list, under the head of Commissioner of Street Cleaning, is a provision of the sum of $86,333.33 for the expense *under the contract* with Mr. Rice of removing the garbage from June 1st to December 1st, 1901. This sum of $86,333.33 is the proportionate payment for the seven months, from June 1st to December 31st, at the contract rate of $148,000 *per annum.* After this list was adopted by the Board of Estimates, the Ordinance of Estimates was prepared in accordance with the requirements of the charter, and the said Ordinance of Estimates made provision of removal of garbage in the sum of $93,833.33, being the above-mentioned

sum of $86,333.33 required by the contract with Mr. Rice for the period from June 1st, 1901, to December 31st, 1901, and the sum of $7,500 required for the removal of garbage by scows up to June 1st, 1901.   It is submitted that the passage of the Ordinance of Estimates, with this provision for the appellant's contract included in the appropriation, is a clear legislative recognition of the appellant's contract by the entire municipal government.   A legislative recognition of any right is equivalent to an original grant of such right.   *Koch* v. *North Avenue Railway Co.*, 75 Md. 222, 226; *Basshor* v. *Dressel*, 34 Md. 503, 510, 511; *Morawetz on Private Corporations*, sec. 20; *Kanawha Coal Co.'s case*, 7 Blatchf. 391; *Bow* v. *Allentown*, 34 N. H. 351; *Baer Creek Co.* v. *Baltimore*, 87 Md. 96; *C. & P. Tel. Co.* v. *M. & C. C. of Baltimore*, 89 Md. 714.   We submit, therefore, that the contract is as completely accomplished between the appellant and the municipality of Baltimore as it is possible for any combined action of the public authorities and of Mr. Rice, the contractor, to make it.

The bill in this case was filed after the garbage contract had been consummated by the meeting of the minds of the municipal officials and Rice, the contractor.   When the Board of Awards, on November, 26th, 1900, voted to award the contract to Samuel A. Rice for ten years at his bid of $148,000 per year, the contract was consummated.   *The American Lighting Co.* v. *McCuen*, 93 Md. 703.

Any supposed irregularity in the presentation of Rice's bid would have been a mere informality, which the municipal officers, in their official discretion, could waive, if they considered such waiver for the interests of the city.   In *Smith* v. *City*, 2 Brewster, 443, the lowest bidder for public work neglected before bidding to file a bond conditioned that he would execute the formal contract if he were the successful bidder. This formality was required by ordinance.   The contract was, notwithstanding this omission, awarded him.   JUDGE BREWSTER said:   "The bond required by the ordinance of May 25th, 1860, is not the security to be exacted for the faithful performance of the contract, but simply a guaranty that the

lowest bidder will come forward, give the required security and sign the formal agreement. This is clearly a stipulation which the city authorities might, in the exercise of an honest discretion, insist upon or waive at their pleasure. No corruption or fraud is suggested, nor is it pretended that the city has been or can be injured by the award of the contract to defendant McGlue. The complainant has no standing, and were it otherwise the Act of 1866 commits the whole matter to the council."

The plaintiff has no such interest in the subject matter of the controversy as will authorize him to maintain this suit as a taxpayer. The general rule is undoubted that injuries which affect the public, and which only affect individuals as members of the public, can only be redressed at law by proceedings instituted by proper public officials. No private person can maintain an action to abate a public nuisance without showing an injury differing not only in *degree* but in *kind* from the injury suffered by the public at large. *Houck* v. *Wachter*, 34 Md. 265; *Crook* v. *Pitcher*, 61 Md. 510. There have been many instances where self-constituted guardians of the public welfare, have in the guise of taxpayers, attempted through the aid of an injunction to take the administration of public affairs out of the hands of the elected representatives of the public, and where the suits have failed. *Kelly* v. *Chicago*, 62 Ill. 279, 283; *Starin* v. *Edson*, 112 N. Y. 206; *Carlton* v. *Salem*, 103 Mass. 141, 143; *Droz.* v. *East Baton Rouge*, 36 La. Ann. 307; *Doolittle* v. *Broome Co.*, 18 N. Y. 155; *Craft* v. *Jackson Co.*, 5 Kansas, 518, 521; *Hale* v. *Cushman*, 6 Metc. 425; *Conklin* v. *Fillmore*, 13 Minn. 454; *Miller* v. *Grundy*, 13 Mich. 551.

Here there is no claim of any violation of any chartered powers. The most that is complained of is a failure to observe proper formalities and regularities in bidding on the privilege of doing the work. Nor when the work is to be done by the party to whom the contract was awarded, in the same way that the higher bidder would have done it—that is, by the Syracuse system—and for a smaller sum, can there be any claim that there will, by the awarding of the contract, be any

increase of the burden of taxation, which is the fundamental fact to give the Court jurisdiction of a taxpayer's suit. Again: It is clear that when the suit is merely a controversy between rival tradesmen contending for the business of the city, a Court of equity will not interfere by injnnction on the pretext that the plaintiff is injured in his capacity as a taxpayer. *Kelly, Piei & Co.* v. *Balto.*, 53 Md. 142. It is admitted by the pleadings in this case that the suit is *not* brought by Mr. Packard in good faith, but that he has loaned his name to bring this suit to the American Contracting and Manufacturing Company, an unsuccessful bidder for the contract.

*Wm. Pinkney Whyte* and *Olin Bryan*, for the other appellees, submitted the cause on the brief filed by the appellee Rice.

JONES, J., delivered the opinion of the Court.

This case arose out of the exercise by the Mayor and City Council of Baltimore of the powers conferred upon the corporation by the 14th section of the charter (Act of 1898 chapter 123), which provides that," in contracting for any public work, or the purchase of any supplies or materials involving an expenditure of five hundred dollars or more for the city or by any of the city departments, sub-departments or municipal officers not embraced in a department, or special commissions or boards, unless otherwise provided for in this Article, proposals for the same shall be advertised for, in two or more daily newspapers published in Baltimore City, for not less than ten nor more than twenty days, and the contract for doing said work or furnishing said supplies or materials, shall be awarded by the board provided for in the next section of this article, and in the mode and manner as therein prescribed."

The next section (15) provides that "all bids made to the Mayor and City Council of Baltimore for supplies or work for any purpose whatever, unless otherwise provided * * * shall be opened by a board or a majority of them consisting of the Mayor and certain other designated officials of the city government, that this Board shall " award the con-

tract: to the lowest responsible bidder"; that the successful
bidder "shall promptly execute a formal contract to be ap-
proved as to its form, terms and conditions by the City Solici-
tor" and " shall also execute and deliver to the Mayor a good
and sufficient bond to be approved by the Mayor in double
the amount of the contract price "; that " to all such bids there
shall be attached a certified check of the bidder, and the bidder
who has the contract awarded to him, and who fails to promptly
and properly execute the required contract and bond shall for-
feit said check "; and then prescribes certain conditions that
are to attach to the giving of the check, by the successful
bidder, the amount of the check, and that the checks of the
unsuccessful bidders shall be returned to them after the award-
ing of the contract.

In pursuance of the provisions of the 14th section of the
city charter, which has been recited, the Commissioner of
Street Cleaning, the head of a sub-department of Public Safety
advertised as follows :

" Sealed proposals will be received by the Board of Awards
until 12 o'clock noon on the 14th day of November, 1900,
for the collection and disposal of garbage, dead animals, ashes
and miscellaneous refuse in the City of Baltimore, Maryland.
Specifications and proposal blanks can be obtained from the
office of the Commissioner of Street Cleaning.   All bids for
the collection of garbage and dead animals must be accom-
panied by a certified check for $10,000, payable to the Mayor
and City Council of Baltimore.   All bids for the collection
and disposal of ashes and miscellaneous refuse must be accom-
panied by a certified check for $1,000, made payable to the
Mayor and City Council of Baltimore.   The Board of Awards
reserves the right to reject any and all bids.   Bids must be
inclosed in sealed envelopes addressed, ' Proposals for the col-
lection and disposal of garbage and dead animals ' and ' pro-
posals for the collection and disposal of ashes and miscellan-
eous refuse ' and directed to George N. Numsen, City
Register."

This advertisement was made in pursuance of a purpose on

the part of the Commissioner of Street Cleaning to substitute the contract system for the system which had prevailed in the City of Baltimore for the collection, removal and disposal of garbage, dead animals, ashes and miscellaneous refuse. The specifications, to which reference was made in the advertisement set out, contained the provisions that "each bidder must submit with his bid the scheme of garbage disposal which he proposes to establish, marked so as to correspond to the proposal which it is intended to accompany, and including such plan, specifications and other information as may be necessary to enable the said commissioner to determine the feasibility of it. Each such bidder must be able to insure the completion of the plant as proposed by him, in order that it may be ready for operation by June 1st, 1901. The scheme of disposal must be signed by the bidder or bidders, and such signature must correspond to that affixed to the proposal."

They then made full and particular regulations for the collection and removal of garbage, refuse, &c., but contained nothing further in reference to the scheme or plant to be put in operation for the disposal or reduction thereof more specific than that "the contractor must establish and maintain without cost to the city of Baltimore, beyond price stated in his proposal, such scheme or schemes, with all such wharves, boats, cars, vehicles, buildings, furnaces, boilers, drivers, presses and other devices and apparatus as may be necessary to enable him or them to perform the work specified in his or their contract" and that "the capacity of any plant or scheme established by the contractor must be sufficient to allow any necessary repairs to be made without interfering with the work of disposal." Provision was made in the specifications for six different proposals, 1st, to collect and dispose of all garbage, dead animals and market refuse in the city of Baltimore *   * for five years from June 1st, 1901 ; 2nd, to do the same for ten years from same date ; 3rd, "to collect and dispose of all ashes and miscellaneous refuse in the city of Baltimore *   * for five years from June 1st, 1901 ; 4th, to do the same for ten years from same date ; 5th," to collect and dispose of all

garbage, dead animals, market refuse, ashes and miscellaneous refuse in the city of Baltimore   *   *   for five years ; 6th, to do the same for ten years.

Bids were made as invited by the foregoing advertisement to the number of five as alleged by the appellant ; and to the number of six as alleged by the appellees.   As to which is correct in this particular is not material to the inquiry here. These bids were not opened on the 14th of November, 1900, the day indicated in the advertisement for proposals for the bids to be in ; but further time was granted to the 21st of November upon the request of parties desiring to bid who represented that they were unable to procure copies of the specifications in time to enable them to prepare a bid by the time required in the advertisement.   On the 21st of November, 1900, the bids were opened and it was found that in point of fact the lowest bid was that of Michael T. Horner who did not accompany his bid with a proposal for any sanitary scheme for disposal and reduction of garbage, &c., but proposed to remove and dispose of it by depositing it and using it as a fertilizer on a farm belonging to him about eight miles from the city of Baltimore and upon neighboring farms equally distant ; or " to reduce the said garbage by such methods of reduction, as is in accordance with most approved of practically successful scheme of reduction, and which shall be approved by the Commissioner of Street Cleaning of the city of Baltimore."

This bid seems not to have been considered.   The record does not specifically state why.   But the bids when they were opened were referred by the Board of Awards to the Commissioner of Street Cleaning for tabulation and report thereon, and the commissioner in his report states that the author of this bid "did not comply with the specifications in that he did not present any sanitary disposal scheme whatever as required by the specifications."

Other than Horner's bid, the lowest bid was one by the appellee, Samuel A. Rice, whose proposal was to collect and remove the garbage mentioned in specifications, "to a suitable

place in or out of the city of Baltimore, and there reduce it by the method or process now in use for reducing garbage, at Syracuse, New York, or with such modifications of that method or process as shall from time to time, be approved by the Commissioner of Street Cleaning, or he will reduce the said garbage by the use of such other method or process of reduction as shall be mutually agreed upon by the contractor and the Commissioner of Street Cleaning." No plans of the system proposed to be used by this bidder were filed with the proposal. No bid was accepted on the 21st of November and three days later, on the 24th of November, 1900, the appellee, Rice, sent to the Commissioner of Street Cleaning a letter addressed to him and the Board of Awards jointly, accompanied with specifications as called for in the advertisement for proposals as respected the collecting and removing of garbage, &c., for the purpose of making clerical corrections, as he explained, in the specifications which he had before handed in, and with these sent also plans and specifications of a system for the reduction of garbage, not of the Syracuse system which he had already proposed to use, but of the system in use in Detroit.

The full terms of other bids do not appear in the record, but this is not material. It is sufficient to say that it appears that each one proposed a different system for the reduction and disposal of garbage, except that one was a proposal to use the Syracuse system, *or* another system named in the bid. The foregoing appear in the record as undisputed facts, and upon this state of facts the contract for the removal and disposal of garbage was awarded to the appellee, Samuel A. Rice, according to the 6th proposal named in the specifications in the office of the Commissioner of Street Cleaning. Whereupon the plaintiff filed the bill of complaint which inaugurated this suit, on his own behalf as a taxpayer and on behalf of other taxpayers, praying for an injunction to restrain the carrying out of the contract upon the ground that the requirements of the charter, as expressed in the provisions therein which have been herein set out, were not ob-

served in awarding the contract; and that the same was not awarded according to competitive bidding as therein contemplated. The appellees answered the bill and the case was heard below upon bill and answer by agreement of the parties. It was further agreed that the exhibits appearing in the record as filed by the plaintiff should be considered as having been filed with the bill "and as if established by proof."

It is from the bill, answers and exhibits that the facts which have been recited, and which are all that we need to be concerned with, are made to appear. This is not a case in which the Court has to deal with any question of fraud. It is simply a question of power possessed by the municipality concerned, as to the making of contracts of the character of the one here drawn in question. Now what is this power? It is defined in the two sections of the charter of the city of Baltimore, which have been set out. When "contracting for any public work or the purchase of any supplies or materials * * * proposals for the same shall be advertised for" by the city or any of its departments," and the contract for doing the said work or furnishing said supplies or materials, shall be awarded "by the Board of Awards as provided in section 15, and *in the mode and manner as therein prescribed.*" Here the Board of Awards in the action it is to take is expressly limited to the exercise of the power conferred upon it in section 15. In this section there is but a single power conferred upon it which is to open the bids and "award the contract to the lowest responsible bidder." It of course, must exercise a discretion as to the responsibility of the bidder. Beyond this the section will be searched in vain for any other or broader power than to declare the lowest bidder and award the contract to him.

This board is not given any power to make comparisons as to, nor to determine anything respecting materials offered or work proposed or the means of its execution; nor is there any authority vested in any other agency of the municipality to do this in connection with awarding contracts under the provisions of the two sections of the city charter in question

after proposals have been made in response to advertisement for them for purposes named in these sections. There is no judgment authorized to be exercised in any way upon what is offered or proposed whether in the way of materials or of work after proposals made. The one single thing to be done is that the board, provided for in section 15, shall open the bids and declare who has offered to furnish the materials or do the work, as the case may be, for the lowest price, subject only to seeing that the bidder is responsible. Necessarily then all the essentials that the municipality designs that the contract proposed to be made shall contain, is to be determined before proposals are invited and are to be placed before the bidder as the basis of his bid. Otherwise there would be no standard by which bidding could be made with the definiteness and precision which would leave nothing to be done except to ascertain the lowest bid. And it may be said there could be no effective competition in bidding which it was the evident design of the provisions of the charter we are considing to secure.

That proposals for contracts under these provisions should be made by bidders with knowledge of and with reference to all the essential elements of the contract into which they are invited to enter is enforced by other considerations. How otherwise could the Board of awards perform its only other function in this connection, after declaring a party the lowest bidder and "award the contract" to him? This board has no concern with features, provisions or elements of the contract it is to award; and its award therefore must be of a contract the essential features, provisions and elements of which are already determined. It is also provided that when the Board of Awards has acted upon the bids the successful bidder must "*promptly* execute a formal contract to be approved as to its form, terms and conditions by the City Solicitor." Now the City Solicitor is not authorized to make the contract nor to add to or take from one that is proposed and accepted between the city and the bidder. He is only authorized to see that the contract made is put into form and formally exe-

cuted.   This has already been said in substance by this Court through JUDGE FOWLER in the case of *The Amer. Lighting Co.* v. *McCuen et al.*, 92 Md. 703.   It may be asked then, where is the City Solicitor to learn what the contract is that he is to see put into form except from what has been proposed by the city and agreed to be done by the bidder ?

Having defined the power of the city under the sections of its charter which prescribe how contracts of the kind we are here dealing with shall be made, we are now to inquire whether in the case before us this power has been exercised within its limitations.   We think it quite clear that it has not been so exercised.   The contract the city proposed to make in this case when advertisement was made for proposals was intended to embrace or provide for not only the collection and removal of garbage, &c., but a method or " scheme of garbage disposal."   The " scheme " or plan of " disposal " was an important feature in the contract designed to be made and was evidently so regarded by the city authorities.   As has been said what the contractor was to do with respect to the collection and removal of the garbage was set out in the specifications furnished by the city as the basis of his bid with care and particularity.   The indefiniteness of the specifications in regard to the other branch of the proposed contract, the " disposal " of the garbage after its collection and removal, appears from the clauses thereof in that regard which have been set out or referred to.   No scheme or method of disposal was indicated or described therein to be bid upon or contracted for, nor were any plans for operating or putting into effect such scheme or method as might be adopted.   Bidders were instructed each for himself to present a " scheme of garbage disposal ;" and as we have seen from the facts set out that is what was done by the bidders.   When the bids came in it was found that each bidder had proposed a different scheme ; some—alternative schemes with an indefinite offer to employ any other scheme or plan that might thereafter be agreed upon between the bidder and the Commissioner of Street Cleaning. That is to say no bid was made or could have been made with

reference to any ascertained standard or upon any definite or precise basis.

It was also provided in the specifications that each bidder should include with the scheme of garbage disposal which he proposed to establish such plan, specifications and other information as might be necessary to enable the Commissioner of Street Cleaning " to determine the feasibility of it." This must mean that the scheme proposed by each bidder was to come under the judgment of the commissioner after the bids had been submitted and opened ; and implies that a discretion was then to be exercised as to the adoption of the scheme according to the opinion the commissioner might form of its " feasibility." It does not appear how effect was to be given to this judgment of the commissioner when exercised ; but it must have been intended that it was to have some influence or agency in the consummation of the contract. It is needless, however, to speculate as to the intent of the provision in question. The Commissioner of Street Cleaning has no such power in reference to contracts to be made under the law applicable in such a case as this, as was thus reserved to him in the specifications. After the bids have been submitted and opened the whole power as to awarding the contract is with the Board of Awards and we have seen what that power is.

The object of the provisions of the municipal charter we are considering is to prevent favoritism and extravagance in the making of municipal contracts. The effect of these provisions to produce the result intended would be greatly impaired, and the purpose of them might be entirely defeated if the method of awarding contracts under them which was pursued in this case could be sustained. The absence of any definite and precise basis for competition among the bidders ; the allowing of each bidder to submit his own independent proposition as to what would form an important element of the contract ; and the reservation of a discretion to be exercised by a municipal authority as to an essential of the contract after bids had been submitted, make the contract here the subject of controversy violative of the intent and purpose

of the provisions of the law in question as well as of the essential character of competitive bidding.

We have reached our conclusions by giving to the sections of the charter of the city of Baltimore, which are the source of authority for the making of contracts of the kind we are passing upon in this case, such construction as we think reason required. There is no lack of pertinent authority going to support the views we have expressed. We may refer to two cases strongly analagous to the case at bar and in which the reasoning clearly illustrates our views and is convincing as to their soundness. These are *Mazet* v. *City of Pittsburgh et al.*, 137 Pa. 548, and *Fones Bros. Hardware Co.* v. *Erb*, 54 Ark. 645. In the first of these it appears that an Act of Assembly had provided "that all work and material required by the city shall be performed and furnished under contract to be given to the lowest responsible bidder under such regulation as shall be prescribed by ordinance and it shall be the duty of Councils forthwith to enact such ordinances." An ordinance provided that "all contracts exceeding in value $50 shall be let or entered into only after proposals therefor shall have been inserted by advertisement in the official newspapers of the city for not less than five days;" and a subsequent one "that all contracts shall be awarded after due public notice upon such specifications as shall be approved by the Department of Awards." Under this law and the ordinances the city authorities advertised for bids for the paving of certain streets, among them a street called Craig street. No plans or specifications for paving this street, special to the street, were furnished except plans showing surface of the street, number of square feet to be paved and number of linear feet for curbing. Bidders were instructed by the Chief of Department of Public works to prepare their own specifications to be inclosed with their bids and he refused to furnish specifications. After advertisement and receiving of bids a contract was awarded for paving Craig street with asphalt—a material which had not been mentioned in the advertisement nor in any specifications for the work of paving. The contract was restrained and de-

clared void on application to a Court of appropriate jurisdiction ; and on appeal this action of the lower Court was approved. The Judge who spoke for the appellate tribunal said : "How can there be a *lowest* bidder when parties proposing to bid are instructed to prepare their own specifications and submit them with their respective bids ? The expression 'lowest bidder' necessarily implies a common standard by which to measure the respective bids, and that common standard must necessarily be previously prepared specifications of the work to be done, and materials to be furnished, etc., specifications freely accessible to all who may desire to compete for the contract, and upon which alone their respective bids must be based."

In the next case above referred to, in which many authorities are cited and reviewed, it appears that the Constitution of the State of Arkansas contained this provision. "All contracts for erecting or repairing public buildings or bridges in any county or for materials therefor, or for providing for the care and keep of paupers where there are no almshouses shall be given to the lowest responsible bidder under such regulations as may be provided by law." An Act of the Legislature of the State authorized the " Board of Bridge Commissioners to advertise that they are ready to receive plans, specifications and bids for the erection of a county bridge from which they will adopt a plan and accept the accompanying bid." Attempted action under this law was resisted in the Courts and the law was held to be void, the appellate Court saying in respect to the constitutional provision, " it demands in the letting of contracts a basis upon which bids can be compared with mathematical precision and which leaves nothing to official discretion after bids are received." Other cases not so closely analogous to the case at bar but illustrative of the principle that there is required in the letting of contracts by competitive bidding a strict observance of limitations upon power are *Ricketson* v. *City of Milwaukee,* 47 L. R. A. 685 ; s. c., 105 Wis. 591 ; *McIntyre et al.* v. *Perkins et al.,* 9 Philadelphia, 484, and the case in this Court of *Mayor, &c.,* v. *Keyser*

*et al.,* 72 Md. 106. Reference may also be had to *Lawyer's Rep. Anno.*, vol. 26, page 707 ; *Anderson* v. *Board of Public Schools* (notes) for cases there cited.

For the reasons given we are constrained to hold the action of The Board of Awards in awarding the contract in question to the appellee Samuel A. Rice to be *ultra vires* and void, and we think its execution should have been enjoined by the trial Court.

Holding the action of the Board of Awards to be *ultra vires* and void disposes of the defense made by the appellees that the contract awarded to Rice by this board had been ratified and confirmed by the whole city government. The contract was made with the city. The Board of Awards was the agency only through which it was made. Obviously the city corporation cannot attempt to do an act which is void and subsequently make the act valid by ratification. In the case of *Mazet* v. *City of Pittsburgh*, 137 Pa., *supra*, the contract which was there held invalid had been ratified and approved by Councils.

In the same case it was also held that the allegation of the want of good faith in the plaintiff in bringing the suit, the same as is made here, was immaterial in such case ; that the plaintiff as taxpayer had a clear legal right to enforce ; and the motives that actuated the bringing of the suit were immaterial. In the case of *Mayor, &c.*, v. *Keyser et al.*, 72 Md. *supra*, this Court adopted the following language of the Judge (DENNIS, J.), who decided the case below where it was said the complainants (taxpayers) " have a right to require that the money they have contributed for the public benefit, shall be spent only for the purposes, and in the manner authorized by law, and that every security designed to protect its proper expenditure shall be faithfully observed. This right is a vital one to them and they are required to allege no other injury than that it is about to be violated. They will be injured, if the violation is permitted, by the act of violation alone." If then where a municipal corporation is proceeding to make a contract which it has no power to make as was being done in the case jus

Md.]                              Syllabus.

referred to, and as we find has been done in this case which contract will involve the expenditure of the money of the tax-payer such taxpayer sustains, by that act, an injury which gives him a clear legal right to redress, it is not perceived how, when he seeks that redress, his motive can take away his right.   As we have seen, it was held in the case of *Mazet* v. *Pittsburgh, supra*, that the motive alleged could not be allowed that effect.

It follows that the decree of the Court below must be reversed and the cause will be remanded that proceedings may be had in that Court in conformity to the opinion of this Court.

> *Decree reversed and case remanded with costs to the appellant.*

(Decided January 15th, 1902.)